THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* CARL JACOB KUNZ, Appellant.

Argued October 5, 1949; decided December 29, 1949.

*Osmond K. Fraenkel* and *Mercedes Hoffman* for appellant. I. Section 435–7.0 of the Administrative Code of the City of New York is unconstitutional on its face since it prohibits the use of the streets altogether to all persons who would preach, exhort or expound on religious or anti-religious topics who do not fit into certain specified categories. (*Jamison* v. *Texas,* 318 U. S. 413; *Schneider* v. *State,* 308 U. S. 147.) II. The section sets up no proper standards for the exercise of official discretion. (*Lovell* v. *City of Griffin,* 303 U. S. 444; *Saia* v. *New York,* 334 U. S. 558; *Hague* v. *C. I. O.,* 307 U. S. 496.) III. The section requires and enables the police commissioner to determine as a censor who may address the public on the streets. (*Cantwell* v. *Connecticut,* 310 U. S. 296; *Largent* v. *Texas,* 318 U. S. 418; *Jamison* v. *Texas,* 318 U. S. 413; *Thomas* v. *Collins,* 323 U. S. 516; *Lovell* v. *City of Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147; *Hague* v. *C. I. O.,* 307 U. S. 496; *Saia* v. *New York,* 334 U. S. 558.) IV. The section infringes upon freedom of speech and religion by the use of broad and vague prohibitions upon the content of a speaker's remarks. (*Cantwell* v. *Connecticut,* 310 U. S. 296; *Thomas* v. *Collins,* 323 U. S. 516; *Terminiello* v. *Chicago,* 337 U. S. 1.) V. The section requires previous registration and identification

as a condition to exercising the right to make a public speech. (*Thomas* v. *Collins,* 323 U. S. 516.) VI. The unconstitutional features of the section apparent on its face are confirmed and emphasized by the rules and regulations and official practice and procedure of the police department and the police commissioner. (*People* v. *Nahman,* 298 N. Y. 95; *Cox* v. *New Hampshire,* 312 U. S. 569.) VII. The section as applied to defendant is unconstitutional and an abridgement of his freedom of speech and religion. (*Saia* v. *New York,* 334 U. S. 558; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Sellers* v. *Johnson,* 163 F. 2d 877, 332 U. S. 851; *West Virginia State Bd. of Educ.* v. *Barnette,* 319 U. S. 624.) VIII. The unconstitutional features of the section are not cured by the possibility of judicial review of administrative acts. IX. *People* v. *Smith* (263 N. Y. 255), relied on by the court below, does not represent the law at the present time and should not be followed in this case.

*John P. McGrath, Corporation Counsel* (*Joseph J. Lucchi* and *Seymour B. Quel* of counsel), for respondent. I. A virtually identical statute was upheld in *People* v. *Smith* (263 N. Y. 255), which has not been overruled. II. Ordinances similar to section 435–7.0 have been found valid by the Court of Appeals and by the United States Supreme Court. (*Cox* v. *New Hampshire,* 312 U. S. 569; *Prince* v. *Massachusetts,* 321 U. S. 158; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *People* v. *Nahman,* 298 N. Y. 95; *People* v. *Hass,* 299 N. Y. 190; *People* v. *Lewis,* 295 N. Y. 42; *Kovacs* v. *Cooper,* 336 U. S. 77.)

DESMOND, J. Defendant, a clergyman, was convicted and fined $10, after a trial before a New York City Magistrate, for violating section 435–7.0 of that City's Administrative Code. The material parts of that statute (which is set out in full at the beginning of Judge CONWAY's opinion in this case) may be summarized as follows:

1. It shall be unlawful in any New York City street, for anyone to collect a crowd for public worship or exhortation, or to ridicule or denounce any religious belief, or to preach atheism or agnosticism;

2. However, any clergyman or authorized representative of any religious group, or of any atheistic or agnostic society, may

preach or expound his cause, in any public place specified in a permit which may be granted him by the police commissioner;

3. Any violation is punishable by a fine of not more than $25, or thirty days' imprisonment, or both.

Appellant insists that this law is unconstitutional on its face, for a number of reasons, principally because, as defendant thinks, it allows the police commissioner, uncontrolled by any proper standards, " to determine as a censor who may address the public on the streets ", and because it prohibits any ridicule or denunciation of religion by anyone. We do not think that the statute, as administratively construed by the New York City Police Department and as applied here, is invalid for either of those asserted reasons.

Although this section says in its first paragraph that a street-preaching permit " may be granted and issued " by the police commissioner, to any of the persons listed, this record shows that such a permit is granted to any such person, on mere application therefor. Each such permit is for a calendar year and specifies no time or place for speaking, but, on the face of the permit there is printed a police department regulation requiring the permittee to notify the commander of the police precinct concerned, of the proposed time and place of any street meeting, whereupon " The Commanding Officer will approve of the location providing it does not interfere with Traffic or other local conditions." Reading those regulations into the ordinance, as we can and should (see *People* v. *Nahman*, 298 N. Y. 95, and *People* v. *Hass*, 299 N. Y. 190, appeal dismissed 338 U. S. 803, rehearing denied 338 U. S. 881), we construe the ordinance as requiring the commissioner to give an annual permit for street preaching, to anyone who, like defendant, is a minister of religion, and as allowing police control of meetings only to the extent of requiring advance notice to a police captain who must approve of the location, unless traffic conditions there make it inexpedient to use that site for such purposes. Thus read, the law is no more than a necessary and reasonable regulation of the use, for public meetings, of the crowded streets of the world's greatest city, " general and non-discriminatory legislation [regulating] the times, the places, and the manner of " holding street meetings (*Cantwell* v. *Connecticut*, 310 U. S. 296, 304; see *Cox* v. *New Hampshire*, 312 U. S. 569). The pos-

sible unconstitutionality of this permit procedure, as curtailing the rights of those who are not clergymen, like defendant, is not for defendant to argue or for us to consider in this case (*O'Kane* v. *State of New York*, 283 N. Y. 439, 449). Thus, that part of the statute which deals with permits is clearly not unconstitutional. The other part, forbidding the denunciation or ridicule of religion, will be dealt with herein after we have summarized the additional facts of this case.

In 1946, defendant applied to the commissioner for, and received, a permit for street preaching. The meetings he held during that year brought to the commissioner's desk a flood of complaints from citizens who charged that defendant had, in violent words, denounced two great religions, each of which has very large membership in New York City. The commissioner thereupon, on notice to defendant, scheduled a hearing on such charges, before a deputy commissioner. A two-day hearing followed, at which defendant and eighteen complainants appeared and gave testimony. The complaints were amply proven, and the commissioner wrote defendant that his permit was revoked, because he had " contrary to the provisions of law under which the permit was issued, ridiculed and denounced religion ". Later defendant, successively, applied for permits for 1947 and 1948, but in each instance he was notified of disapproval. On September 11, 1948, without a permit, he held a religious meeting at Columbus Circle, in Manhattan, and again delivered himself of violent diatribes against the same religions he had castigated before. He was arrested and charged with street preaching without a permit. On the trial he admitted that, while there was no trouble at his exhortations when a police officer was present, trouble there was when the police were absent.

While the ordinance does not specifically mention revocation of licenses, for cause, we think such power is fairly implied, and, in any case, the alleged illegality of a revocation is reviewable by appropriate civil proceedings in the nature of certiorari (Civ. Prac. Act, art. 78). Since the licensing law was valid, one who preached without a license was guilty of a violation, and any impropriety of the revocation of a former license was no defense. We think, too, that once the 1946

permit was revoked for good reasons, the commissioner was not bound to issue further permits. The commissioner had no reason to assume, and no promise was made, that defendant wanted a new permit for any uses different from the disorderly ones he had been guilty of before. The police regulations, printed on the permit and mentioned above, say that " all meetings must be conducted in an orderly manner " — surely a modest requirement — and defendant had shown that his utterances were of the kind that usually do, and in defendant's case, did, result in disorder, except when the police provided protection. As the Magistrate pointed out at the close of this trial: " in a large city like this City of New York, bearing in mind that religion is a very tender emotion amongst most human beings, that this statute is not only constitutional but desirable, extremely desirable, that for the protection of the people who are going to do the speaking themselves it is necessary in a big city like ours where people become so emotional and might very well inflict serious bodily harm." Actually, what defendant here insists on as his constitutional right is not only a permit irrevocable for any cause, but the regular attendance at his meetings of a cordon of policemen to curb the wrath of those whose deepest feelings he wantonly wounds. He claims a constitutional right to incite riots, and a constitutional right to the services of policemen to quell those riots. It seems to us that if a community can bar from its streets all raucously noisy advertising devices (*Kovacs* v. *Cooper,* 336 U. S. 77) it may stop defendant from starting religious wars on New York's teeming thoroughfares.

It may be that the first sentence of this ordinance, making it unlawful for anyone " to ridicule or denounce any form of religious belief, service or reverence ", if read off by itself, and without relation to the rest of the ordinance, or of these facts, might be thought unconstitutional. But we have no such question here. This man got his permit with no questions asked as to what he would preach. But he used that permit to spew out insults and epithets; public order and decency required that he be stopped (*Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572), and after due hearing and full proof, he was stopped. As the Supreme Court said in the *Chaplinsky* case (*supra*) no constitutional problem is raised by the prevention and punishment of

" insulting or ' fighting ' words — those which by their very utterance inflict injury or tend to incite an immediate breach of the peace " (315 U. S. at p. 572). It is the duty of the police to end such disorder.

In arriving at these conclusions we have not relied on *People* v. *Smith* (263 N. Y. 255, appeal dismissed 292 U. S. 606) which held valid and constitutional this very statute, but have considered the question anew, on the facts of this particular case.

The judgment should be affirmed.

CONWAY, J. (dissenting). Defendant has been convicted of unlawfully conducting a religious meeting without a permit in violation of section 435–7.0 of chapter 18 of the Administrative Code of the City of New York. The conviction has been affirmed by the Appellate Part of the Court of Special Sessions and the case is here by permission of a Judge of this court.

Section 435–7.0 reads, in full, as follows:

" a. *Public worship.*— It shall be unlawful for any person to be concerned or instrumental in collecting or promoting any assemblage of persons for public worship or exhortation, or to ridicule or denounce any form of religious belief, service or reverence, or to preach or expound atheism or agnosticism, or under any pretense therefor, in any street. A clergyman or minister of any denomination, however, or any person responsible to or regularly associated with any church or incorporated missionary society, or any lay-preacher, or lay-reader may conduct religious services, or any authorized representative of a duly incorporated organization devoted to the advancement of the principles of atheism or agnosticism may preach or expound such cause, in any public place or places specified in a permit therefor which may be granted and issued by the police commissioner. This section shall not be construed to prevent any congregation of the Baptist denomination from assembling in a proper place for the purpose of performing the rites of baptism, according to the ceremonies of that church.

" b. *Interference with street services.*— It shall be unlawful for any person to disturb, molest or interrupt any clergyman, minister, missionary, lay-preacher or lay-reader, who shall be conducting religious services by authority of a permit, issued hereunder, or any minister or people who shall be performing

the rite of baptism as permitted herein, nor shall any person commit any riot or disorder in any such assembly.

" c. *Violations.*— Any person who shall violate any provision of this section, upon conviction thereof, shall be punished by a fine of not more than twenty-five dollars, or imprisonment for thirty days, or both."

The police commissioner, in compliance with the second sentence of subdivision a (*supra*) has adopted certain implementing administrative procedure. Applications for a permit are made at the division of licenses of the police department. Permits are issued for a year, expiring on December 31st of the year of issuance. No fee is charged for the permit. The questions on the application blank for the permit are designed to elicit information as to whether the applicant is one of the persons specified as eligible for a permit. No inquiry is made in the application blank as to the proposed time and place of the religious meetings to be held by the applicant, but the pertinent regulations of the police department, which are printed on the permit itself, provide in part that the holder of the permit will be required to notify the commanding officer of the precinct of the time and location of any street meeting he or she intends to hold, and that the commanding officer " will approve " of the location provided it does not interfere with traffic or other local conditions.

Defendant describes himself as a preacher who goes out on the highways and byways and preaches the word of God. He speaks under the auspices of " Outdoor Gospel Work " of which he is the director. He has had no formal training beyond grammar school — " Just the Word " — but was " ordained to the work of the Gospel Ministry " in 1946 by a " counsel of pastors " in Brooklyn and has been preaching for about six years.

In 1946, defendant applied for and received a public worship permit. The police department soon received numerous complaints that he had ridiculed and denounced certain religious beliefs while conducting his meetings. Hearings at which eighteen complainants appeared and testified were held by a deputy police commissioner on two days in October and November of 1946. The deputy police commissioner determined that the complaints were substantiated and revoked defendant's permit. The letter so advising defendant read in part as

follows: " The complaints, in my opinion, have been fully substantiated. My determination in the matter is that you have, contrary to the provisions of law under which the permit was issued, ridiculed and denounced religion, and I am, therefore, in the exercise of discretion, as provided by law, revoking your permit effective forthwith." Defendant applied for another permit the next year, 1947, and again in 1948. Each time he received a notice that his application had been " Disapproved ".

On September 11, 1948, commencing about 9:00 p.m., defendant conducted a religious meeting at Columbus Circle, between 58th and 59th Streets, in New York City. He was standing on a box or platform addressing a group of approximately twenty people. According to the testimony of the arresting officer and two members of the street audience, a major portion of defendant's address was devoted to attacks upon the Roman Catholic Church, and upon the Jewish people and Jewish faith. As to the Roman Catholic Church, for instance, he said that it made merchandise out of souls; that it is a religion of the devil. As to the Jewish people and their faith, he said " All the garbage that didn't believe in Christ should have been burnt in the incinerators. It's a shame they all weren't."· Before he ascended the platform, another speaker, apparently arranged for by defendant, had been speaking about the Jewish people and when some in the audience objected, the defendant spoke of the latter as " Christ-killers." Defendant did not deny the attacks but sought to justify them. There is no evidence of any disorder or breach of the peace in connection with this particular meeting, but defendant testified, generally, that while he had " no trouble at all " at his meetings when a police officer was present, he did have trouble in the absence of an officer. About 10:45 p.m., after he had been conducting the meeting for nearly two hours, a police officer approached defendant and asked him for his permit to conduct the meeting. Defendant, of course, did not have one and was served with a summons for violation of the Administrative Code.

At the close of the People's case in the Magistrate's Court, counsel for defendant moved to dismiss the complaint on the ground that the statute upon which it was based was unconstitutional on its face as an abridgement of the freedoms of religion and speech guaranteed by the Federal and State Constitutions.

At the close of the case, defendant's counsel renewed the motion on the ground that the statute as applied was unconstitutional.

The First Amendment to the Constitution of the United States guarantees the rights of freedom of speech, press, religion and assembly against abridgement by congressional action, and the due process clause of the Fourteenth Amendment protects those rights against invasion by State or municipal action. (*Lovell* v. *City of Griffin,* 303 U. S. 444, 450, and cases there cited.) Beyond that, however, our own State Constitution is explicit in assuring those rights within our borders. (N. Y. Const., art. I, §§ 3, 8, 9.) But freedom of speech, press, religion, and assembly, often denominated our " civil liberties ", are not absolute rights to be indiscriminately exercised under all circumstances and under all conditions. Social welfare requires, in certain instances, reasonable regulation of such activities which, unrestrained, would produce calamitous or undesirable results — not only for the locality and public order but also, in the long run, for the individual involved.

Since our streets and public places are traditionally and sometimes the only available forum for the dissemination and propagation of ideas, the widest possible latitude must be permitted thereon for free expression and communication, however unpopular or misguided such ideas may seem to be. Municipalities, however, have a deep and legitimate interest in the manner in which their streets and public places are used. Specifically, municipalities have the power and are charged with the duty of maintaining safety and order upon streets and in public places for the comfort and convenience of the community. It is a matter of common knowledge that " collecting and promoting " assemblages of persons by street speakers sometimes occasions altercations and breaches of the peace. Particularly may that be so when the assemblage on the street is for public worship or exhortation. Likewise, it is common knowledge that such assemblages may disrupt traffic, both pedestrian and vehicular, and destroy the primary purpose of the streets as a means of travel and transportation from place to place. These are evils with which the municipality must cope and which the courts, subject to the constitutional guarantees, must recognize. In dealing with the problem, all branches of government must try to accommodate fairly the twin goals of unlimited freedom

of speech, religion and assembly for all and the vigilant protection of the comfort, safety and convenience of all. This problem was well analyzed by Chief Justice HUGHES in *Cox* v. *New Hampshire* (312 U. S. 569, 574, quoted hereafter at pp. 288–289 of this opinion).

The statute before us is said to be unconstitutional on its face, i.e., that under no circumstances may it be constitutionally applied. That contention is predicated, however, upon certain assumptions as to the question before the court and as to the scope and operation of the statute, which in our view are incorrect. We must first construe and interpret a statute so that its exact meaning may be clear before an attempt is made to determine whether it is violative of the Constitution. In approaching that primary task, we must adopt the basic principle that, when possible, a statute will be construed and interpreted in such manner as to avoid not only a finding of unconstitutionality but also to avoid any serious doubt upon that score. The cogent reason behind that principle is that legislative bodies, no less than the courts, are presumed to be imbued with respect for our constitutional provisions and to be unwilling to destroy a right guaranteed by the Constitution. (*People* v. *Barber,* 289 N. Y. 378, 385.) Thus, if there be any possibility that an enactment may be read in such manner as to avoid objections as to its constitutionality, that construction is to be preferred.

Since defendant is concededly within the group of persons specified in the second sentence of subdivision a, and has not been convicted of ridiculing or denouncing any form of religious belief, service or reverence, the sole issue before us, in considering whether the statute is void on its face, is whether that portion, applicable to a person so situated as the defendant, can be constitutionally applied under any circumstances. (*Marbury* v. *Madison,* 1 Cranch [U. S.] 137; *Rescue Army* v. *Municipal Court of Los Angeles,* 331 U. S. 549, 568 *et seq.,* and cases there cited; *Headley* v. *City of Rochester,* 272 N. Y. 197, 204; *O'Kane* v. *State of New York,* 283 N. Y. 439, 449.) In deciding that issue we must read the requirements of the statute in the light of administrative procedures set up by the police department to implement it. Thus, we find, it provided that certain persons, of whom defendant is one, may obtain permits from the police commissioner to conduct reli-

gious services in any public place or places specified in the permit. The police commissioner obviously sought to lighten the burden of continuous daily or weekly applications for such permits by adopting regulations authorizing the issuance of a blanket permit, effective for the applicant for a year, and requiring the permittee merely to notify the local precinct commander of the time and place of any street meeting he or she might intend to hold. In ultimate effect, the commissioner issues a permit permanently to those persons specified in subdivision a, merely requiring a new application each year as a current administrative measure, thus assuring for himself an up-to-date list of living, practicing individuals who intend to conduct religious services on the public streets. The regulations further provide that said precinct commander " will approve " the location provided it does not interfere with traffic or other local conditions.

Reading the statute and the administrative machinery together, and mindful of the constitutional prohibition against antecedent censorship, we read it to provide that the police commissioner is under a duty to issue the permit as a matter of course upon application by a person eligible therefor. This construction of the statute is warranted by its terms and obviates constitutional objections.

There is no doubt that the statute was enacted with a twofold purpose. One objective was to lessen the possibility of disorder or breaches of the peace reasonably to be foreseen as a result of unregulated collection of assemblages in the streets for the espousal of, or attacks upon, religion in general or some particular practice or form of religious belief. The second aim was to insure to the general public, without undue interruption or impairment, the normal use of the streets as a means of travel and transportation.

The first objective is sufficiently satisfied by the permit requirement itself, for, once put on notice that such a meeting will be held, the police may take such precautions as appear necessary. We see no warrant in the statute for the exercise of discretion by the police commissioner as to whether or not a particular applicant for a permit is likely to discuss matters which would have a tendency to provoke dispute and disorder. The statute does not give the commissioner any such express

power and, since such discretion would confer upon him a power of antecedent administrative censorship, we certainly should not read it into the statute by construction. To allow the commissioner to refuse a permit whenever, in his discretion, he thought that the applicant might by his utterances provoke disorder or a breach of the peace would undoubtedly be extremely effective in preventing such occurrences, but by the same token such a discretion would make the commissioner a censor over what might and what might not be discussed on the streets of the city. That the socially desirable end of prevention of disorder may not thus be attained by infringement upon the freedom of speech and assemblage is firmly established. (See *Hague* v. *C. I. O.,* 307 U. S. 496, 514–517; *Terminiello* v. *Chicago,* 337 U. S. 1.) Of course, this does not mean that a street speaker may, with impunity, provoke or incite a riot or breach of the peace. Such conduct is properly declared unlawful by our Penal Law (see, e.g., art. 70, " Disorderly Conduct ", and art. 188, " Riots and Unlawful Assemblies ") and may be punished by appropriate action. The constitutional guarantee requires only that a municipality may not adopt unconstitutional means, i.e., censorship or previous restraint to prevent disorder.

Moreover, in view of the existing permit procedure, the second evident purpose of the ordinance is satisfied by the requirement that a holder of a permit notify the precinct commander of the time and location of any meeting he or she intends to conduct. The commissioner does not purport to make any determination as to the public convenience of the time and place of the proposed meeting *in advance* of the issuance of the permit. That determination is made only *after* the permit is granted. Accordingly, the proper construction of the second sentence of subdivision a, and we so read it, is that the commissioner must issue a permit as a matter of course upon application therefor by an eligible person. At that point the commissioner's power is merely ministerial and not discretionary.

Thus viewed, the permit procedure set up in compliance with the ordinance grants no right of censorship or previous restraint to the commissioner and does not unconstitutionally infringe upon the freedoms of speech, religion and assembly. The permit procedure is substantially identical with that authorized by the park department regulation we unanimously sustained in

*People* v. *Nahman* (298 N. Y. 95) and *People* v. *Hass* (299 N. Y. 190) and the language there used is by analogy appropriate here, substituting the words " public streets " for " public parks ". In the *Nahman* case (*supra*) we said (pp. 102–103) : " The regulation, we repeat, confers no power to suppress the publication of facts or opinions. On the contrary, as we have tried to demonstrate, it is in essence a nondiscriminatory provision which has for its sole objective the safety, comfort and convenience of the people of the city in their appropriate uses of its public parks. To our minds, the regulation — so read — is a reasonable measure of local control which affects civil liberties only in an allowable minor degree."

The *Nahman* and *Hass* cases (*supra*) it should be noted, do not proceed upon the broad theory that the State, or a municipality thereof, has plenary power over the use of its streets and public places and may limit or prohibit, in whole or in part, their use for speeches or meetings. Indeed, those decisions strongly indicate the contrary and, to that extent, would seem to qualify our previous decision in *People* v. *Smith* (263 N. Y. 255). In the *Smith* case (*supra*) we said in part (p. 257) : " The legislative power might forbid public meetings and speaking in the streets entirely. It may limit the use of the streets to certain purposes." Such a theory had been previously expressed by such eminent authorities as Justice HOLMES in *Commonwealth* v. *Davis* (162 Mass. 510) and Justice WHITE, on the affirmance by the Supreme Court, *sub nomine Davis* v. *Massachusetts* (167 U. S. 43, 48). The " plenary power " theory, however, has been specifically repudiated by the Supreme Court in subsequent cases (see *Hague* v. *C. I. O., supra,* at p. 515; *Jamison* v. *Texas,* 318 U. S. 413, 417; *De Jonge* v. *Oregon,* 299 U. S. 353, 364) and by the Massachusetts court itself (*Commonwealth* v. *Gilfedder,* 321 Mass. 335, 340). Thus, in the *Hague* case (*supra*) Justice ROBERTS stated (p. 515): " * * * Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

\* \* \*." By refusing to place our decisions in the *Nahman* and *Hass* cases (*supra*), upon any such broad ground, we have recognized this development.

The permit procedure which implements the second sentence of subdivision a of the ordinance also satisfies the standards of permissible State police power approved by the Supreme Court of the United States. That court has not categorically condemned legislation which requires a permit as a condition to the use of the streets or public places for purposes of discussion, assembly or expression. The court has been careful to acknowledge the direct and legitimate interest of States and municipalities in the preservation of the safety, order and peace of the community. In a series of cases, the Supreme Court has struck down legislation which absolutely prohibits or levies a tax upon persons desiring the use of the streets for the expression or communication of ideas through the medium of handbills or pamphlets or for canvassing. (See *Schneider* v. *State*, 308 U. S. 147; *Jamison* v. *Texas*, 318 U. S. 413, *supra*; *Murdock* v. *Pennsylvania*, 319 U. S. 105; cf. *Lovell* v. *City of Griffin*, 303 U. S. 444, *supra*.) The court has also declared unconstitutional ordinances which require permits, the issuance of which is left to the undefined and uncontrolled discretion of a local official, for such activities on the public streets as solicitation for religious causes (*Cantwell* v. *Connecticut*, 310 U. S. 296), distribution of religious publications (*Largent* v. *Texas*, 318 U. S. 418; cf. *Lovell* v. *City of Griffin, supra*) or operation of a sound truck. (*Saia* v. *New York*, 334 U. S. 558; but cf. *Kovacs* v. *Cooper*, 336 U. S. 77.) The court has invalidated an ordinance which required a permit for public assembly on public streets and places, although the ordinance specifically provided that " said permit shall only be refused for the purpose of preventing riots, disturbances or disorderly assemblage." (*Hague* v. *C. I. O.*, 307 U. S. 496, *supra*.) The court there noted that " uncontrolled official suppression of the privilege cannot be made a substitute for the duty to maintain order in connection with the exercise of the right." (P. 516.) The vice of the ordinance in the *Hague* case was explained by Chief Justice HUGHES in *Cox* v. *New Hampshire* (312 U. S. 569, 577, *supra*): " \* \* \* it did not make comfort or convenience in the use of streets the standard of official action but enabled the local

official absolutely to refuse a permit on his mere opinion that such refusal would prevent ' riots, disturbances or disorderly assemblage.' "

Clearly, none of those situations is presented by the permit procedure here involved in view of our construction of the commissioner's power over issuances of the permits. As we have already indicated, the permit procedure vests no uncontrolled discretion in the commissioner. Instead, he must issue the annual permit as a matter of course upon application therefor by an eligible person. Subsequently, it is true, the precinct commander must determine whether the proposed time and place of the meeting will interfere with traffic or other local conditions. While this power of the precinct commander enables him to exercise a certain restraint upon freedom of speech, the restraint is so small as compared with the obvious social utility and necessity of regulation that it does not violate the constitution. It " is a reasonable measure of local control which affects civil liberties only in an allowable minor degree." (*People* v. *Nahman*, 298 N. Y. 95, 103, *supra*.) The existence of and the reason for that State power to impose slight limitations upon civil liberites in such situations was well stated by Chief Justice HUGHES in the *Cox* case (*supra*). There, the Supreme Court upheld a conviction based upon an ordinance prohibiting an unlicensed parade or procession upon any public street or way. He said in part (p. 574): " Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar

red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public attention to an announcement of his opinions. As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.'' Finally, it is important to note that the present Supreme Court in October of this year refused to review our decision in *People* v. *Hass (supra)*, on the ground that it did not present a Federal question, and thus that a permit requirement is not, in and of itself, an unconstitutional procedure.

Nor does the fact that the permit procedure is limited to the collection of assemblages by speakers on topics pertaining to religion and does not apply to topics unrelated to religion render it invalid. The local legislative body, in its wisdom, may determine that street meetings for discussions of matters or religion are fraught with such potentialities of disorder and violence that some regulation is imperative in the interest of public tranquillity. (For instance, here the defendant quite frankly stated that he had no trouble during his discussions if there were an officer beside him, but that he customarily did when an officer was not present.) Such determination results in a classification founded upon reason, and, as such, is not invalid. This point was squarely decided by us in *People* v. *Smith* (263 N. Y. 255, *supra*), where we said, per Pound, Ch. J. (p. 257): `` * * * The passion, rancor and malice sometimes aroused by sectarian religious controversies and attacks on religion seem to justify especial supervision over those who would conduct such meetings on the public streets. That the ordinance does not cover all street meetings is no objection to a reasonable classification. Practical exigencies and common experience may permit the recognition of degrees of harm and the limitation of regulation to classes where the need is deemed to be clearest.'' Defendant's appeal to the Supreme Court in that case was dismissed for want of a substantial Federal question (292 U. S. 606 [1933]), the three cases cited by that court indicating that the reasonableness of the classification was deemed the question sought to be

reviewed. Thus, on the point of whether the municipality may constitutionally regulate religious street meetings and not others, the *Smith* case (*supra*) is controlling.

While the relevant portions of the statute and the implementing administrative procedure are not in violation of the Constitution, we think it clear that the application of the permit procedure to this defendant constituted a violation of his right of freedom of speech and assembly. As previously stated, a permit, effective for a year, had been duly issued to defendant in 1946. In the fall of that year, however, the permit was revoked by the police commissioner, in his discretion, on the ground that defendant had ridiculed and denounced religion. Applications by defendant for a permit in 1947 and 1948 were disapproved. Manifestly, the reason for such disapproval was the commissioner's determination that defendant, if permitted to speak, would again ridicule and denounce religion.

This conduct on the part of the commissioner was not justified in law and amounted to administrative censorship. It was a previous restraint upon defendant's right to speak. Unlike the application of the permit procedure we approved in the *Nahman* and *Hass* cases (*supra*), the commissioner here utilized the permit procedure to prevent the publication of facts or opinions whatever one may think of them. No such authority is granted to him by the statute itself and, as stated above, it cannot be constitutionally read into it by construction. Assuming that the prohibition against ridiculing or denouncing religion is constitutional, the sole means of enforcement is through a criminal action charging its violation or in a proper case charging disorderly conduct under section 722 of the Penal Law; section 1458 of the New York City Consolidation Act (L. 1882, ch. 410); *People* v. *Galpern* (259 N. Y. 279, 282), and *People* v. *Hipple* (263 N. Y. 242). (See, also, New York City Charter, § 435.) It cannot be enforced by a trial of the alleged offender before an administrative officer, nor can an administrative finding of guilt thereof be made the basis for a refusal to grant a permit.

Police protection may well be necessary to secure for this defendant his constitutional right to speak freely as an ordained Baptist clergyman. The Constitution does not discriminate between those whose ideas are popular and those whose views arouse hatred and animosity — guarantying the right of free-

dom of speech to the former and withholding it from the latter. This defendant has the right to express himself concerning religious beliefs, no matter how misguided and unpopular they may be and if his exercise of that right arouses passion in the community and requires the attendance of police officers, that is a small cost which must be paid by us for our continued freedom. We may expect from his past actions that the defendant will in the future go beyond the mere expression of ideas, and so speak as to incite disturbances and breaches of the peace. When and if he does, he may be punished therefor in an appropriate criminal action but justifiable expectations do not authorize the commissioner to refuse to permit the defendant to speak about religion in the future on the streets of the city of New York.

Since the permit requirement in the second sentence of subdivision a of section 435–7.0 of the Administrative Code was thus unconstitutionally applied to the defendant, his conviction, based upon his failure to possess a permit which he has demonstrated is impossible of procurement, cannot stand. It is not an answer to say that defendant, after exhausting his administrative remedies, should then have retained counsel to institute an expensive and lengthy article 78 proceeding, in order to enjoy his elementary constitutional rights.

The order of the Appellate Part of the Court of Special Sessions should be reversed and the complaint dismissed.

Bromley, J. (dissenting). By its terms section 435–7.0 of the Administrative Code of New York City prohibits the public discussion of religious topics in " any street " of that city by anyone who is not, at least, a member of " any church or incorporated missionary society ", or an " authorized representative of a duly incorporated organization devoted to the advancement of the principles of atheism or agnosticism ". One who is a member of a group permitted to discuss religion may do so " in any public place or places specified in a permit therefor which may be granted and issued by the police commissioner." The statute also makes it unlawful for any person " to ridicule or denounce any form of religious belief " in a street or public place.

As construed by the police commissioner the statute gives him discretion to deny a permit to one whose past conduct

has indicated that, if permitted to speak, he will ridicule and denounce religion, or a particular faith, so as to provoke disorder. Appellant Kunz received a permit to speak during the year 1946. The police commissioner has exercised his discretion to revoke that permit, and to deny Kunz annual permits for 1947 and 1948. The revocation, and presumably the denials, rested upon an administrative finding that Kunz had " ridiculed and denounced religion " upon several occasions in 1946. Kunz has been convicted for conducting a religious meeting without a permit on September 11, 1948, at Columbus Circle in New York City.

Unless the prohibition against ridicule and denunciation of religion shall be read as indicating a criterion to be employed by the police commissioner in determining whether to grant or withhold a permit, the statute provides no limit to his discretion. The law has been so construed by that officer, and his construction accords with the fair import of its terms. It is here immaterial that the police commissioner has followed a practice of granting automatically a permit to any of the persons described in the statute on first application therefor. Moreover, it should be noted that the police commissioner apparently is to determine whether or not an applicant for a permit falls within one of those groups whose speech is tolerated.

Numerous decisions of the Supreme Court of the United States, since this ordinance was sustained by us in 1934 (*People* v. *Smith*, 263 N. Y. 255), indicate clearly that the requirement of a permit for the exercise of the rights of speech, assembly or religion in public places is invalid under the Fourteenth Amendment if the licensing official is afforded discretion to grant or withhold a permit upon criteria so broad as these (*Saia* v. *New York*, 334 U. S. 558; *Largent* v. *Texas*, 318 U. S. 418; *Cantwell* v. *Connecticut*, 310 U. S. 296; *Schneider* v. *State*, 308 U. S. 147; *Hague* v. *C. I. O.*, 307 U. S. 496). In each case wherein such statutes have been sustained it was plain that the permit requirement served only two legitimate ends — to permit determination of the appropriate place and time for a proposed assembly with respect to the convenience of others, and to afford notice to the authorities of an assembly which might provoke disorder — without regard to the content of proposed speech (*Cox* v. *New Hampshire*, 312 N. Y. 569; *People* v. *Hass*, 299 N. Y. 190; *Peo-*

*ple* v. *Nahman,* 298 N. Y. 95). Although a State may venture beyond those purposes in a legitimate effort to avert serious threat of disorder by a statute " narrowly drawn to prevent the supposed evil " (*Cantwell* v. *Connecticut, supra,* at p. 307), no such attempt is apparent in this law.

We are asked to construe the ordinance as precisely analogous to the provisions considered in *People* v. *Nahman* and *People* v. *Hass* (*supra*). The courts have been " inclined to adopt that reasonable interpretation of a statute which removes it farthest from possible constitutional infirmity " (*Kovacs* v. *Cooper,* 336 U. S. 77, 85). However, a limitation inheres in that doctrine; strained and unnatural interpretation should not be employed to preserve a law so vulnerable as section 435–7.0 (see *Yu Cong Eng* v. *Trinidad,* 271 U. S. 500, 519–521).

If the vice of this law were not apparent in its terms, the impact of its administration upon Kunz should demonstrate beyond cavil that he has suffered an invalid and absolute previous restraint upon his right to discuss religion in public. His case affords a striking parallel to *Near* v. *Minnesota* (283 U. S. 697). There the future publication of a newspaper had been enjoined upon the ground that it had offended in the past through publishing " malicious, scandalous and defamatory articles " (p. 703). The evil of the injunction inhered in the censorship it established, for Near could have resumed publication under threat of a contempt penalty for matter found invidious by the court. The absolute and previous restraint upon the speech of Kunz surely can stand upon no stronger ground than the decree condemned in *Near* v. *Minnesota* (*supra*).

Section 435–7.0 of the Administrative Code of New York City should be held invalid upon its face under the Fourteenth Amendment to the United States Constitution and under those provisions of the New York Constitution which guarantee freedom of speech and religion (art. I, §§ 3, 8). The judgment should be reversed and the complaint dismissed.

LOUGHRAN, Ch. J., LEWIS and DYE, JJ., concur with DESMOND, J.; CONWAY, J., dissents in opinion; BROMLEY, J., dissents in separate opinion in which FULD, J., concurs.

Judgment affirmed.