David LIBERMAN and International Society for Krishna Consciousness of North Florida, Inc., a non-profit corporation organized under the laws of the State of Florida, Plaintiffs,

v.

George F. SCHESVENTER, Individually, and as Superintendent of the Castillo de San Marcos National Monument, Cecil D. Andrus, as Secretary of the Department of the Interior of the United States and Griffin Bell, as Attorney General of the United States, Defendants.

No. 78–45–Civ–J–C.

United States District Court,
M. D. Florida,
Jacksonville Division.

March 31, 1978.

**1356**

Hugh A. Carithers, Jr., Jacksonville, Fla., for plaintiffs.

John L. Briggs, U.S. Atty., Robert S. Yerkes, Asst. U.S. Atty., Jacksonville, Fla., for defendants.

## MEMORANDUM OPINION

CARR, District Judge.

### I

The Plaintiffs bring this constitutionally based action for declaratory and injunctive relief under the authority of *Bivens v. Six*

*Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and 28 U.S.C. sections 2201–02. The Plaintiffs have challenged the constitutional validity of a federal regulation which governs the sale and distribution of printed matter in national park areas.[1] They assert that the regulation, promulgated by Defendant Andrus in his capacity as Secretary of the Department of the Interior, violates their rights under the first and fifth amendments to the constitution.

The Plaintiffs' Motion for a Temporary Restraining Order was denied by this court. It was then ordered that the trial on the merits be advanced and consolidated with the hearing on Plaintiffs' Motion for Preliminary Injunction, as permitted by Rule 65(a)(2), Federal Rules of Civil Procedure. Based upon the Plaintiffs' verified complaint, stipulations entered into by the parties, and evidence adduced at the trial, this court makes the following findings and conclusions.

The Plaintiff, International Society for Krishna Consciousness (ISKCON), is a non-profit religious corporation which is organized under the laws of the State of Florida, and which maintains temples and schools throughout the world. Plaintiff, David Liberman, is a Hare Krishna Priest, and is known by the spiritual name of Armarendra Das. Liberman is also President of ISKCON of North Florida, Inc.

The Hare Krishna religion and its scriptures call upon its followers to perform a ritual known as Sankirtan. The ritual consists of approaching as many people as possible in public places, seeking donations, and disseminating literature. Sankirtan is dedicated to spreading the Krishna belief and philosophy, while attracting new members and obtaining financial support for the society's religious activities. The present action stems from the desire of the Plaintiff Liberman and his followers to practice Sankirtan on the grounds of the Castillo de San

---

1. 36 C.F.R. § 2.39 (see text, Appendix A).

Marcos National Monument in St. Augustine, Florida.[2] The Castillo is owned and operated by the Department of Interior through the National Park Service. Defendant Schesventer is the superintendent of the Castillo, and is charged with implementing the regulation which is challenged.

The conflict which culminates in this action is not one which has arisen suddenly and can be sharply circumscribed for purposes of analysis. Hare Krishna devotees first began to practice Sankirtan at the Castillo in 1975. According to Plaintiff Liberman they were at that time asked to leave and threatened with arrest if they remained. They persisted, however, and within a few months were allowed to carry on their activities unhindered.[3] In 1976, however, two Krishna devotees were arrested at the Castillo in connection with their activities there. The charges were subsequently dropped when the parties entered into an informal agreement which allowed the Krishnas to perform their activities in certain areas of the Monument grounds. Restricted areas contained in the agreement were approximately the same areas which have been designated as unavailable for sale and distribution activity by the superintendent pursuant to the challenged regulation.

After operating under the agreement for a time the Plaintiffs contended that the restrictions made it impossible for them to reach a certain percentage of the visitors to the Monument.[4] As a result they then abrogated the agreement. Several arrests followed. The regulation at issue was promulgated soon thereafter, and became effective on July 15, 1977.

The regulation states that the sale and distribution of printed matter will be allowed in national park areas provided that a permit has been obtained from the superintendent. There are five grounds upon which the superintendent must deny a permit, otherwise he "shall without unreasonable delay, issue a permit."[5] One of the stated grounds for denial arises when the applicant has applied for an area of the park which has been designated as unavailable for the sale or distribution of printed matter.[6] The process of designation of areas as being available or not available is governed by subsection (d) of the regulation. This subsection states that areas may be designated as not available only if they are such that the permitted activity would, "(1) cause injury or damage to park resources; or (2) unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic or commemorative areas; or (3) unreasonably interfere with interpretive, living history, visitors services, or other program activities or with the administrative functions of the national park service; or (4) substantially impair the operation of public use facilities or services of national park service concessioners or contractors."[7]

---

2. The Castillo de San Marcos National Monument in St. Augustine, Florida consists of 19 acres of land which was purchased by the federal government and dedicated for public use by President Coolidge in 1924. The main feature of the National Monument is a large fort which was built by the Spanish. Construction of the fort began in 1592 and was completed in 1756. The Castillo de San Marcos National Monument is a major tourist attraction in Florida. According to National Park Service figures approximately 750,000 persons visit the fort each year.

3. Plaintiffs have never requested to perform their activities inside of the fort itself, and the implications of such a request will not be considered here.

4. According to observations and calculations made by Plaintiff Liberman, Krishna devotees were denied access to 50–70% of the visitors to the park on any particular day due to the restricted areas contained in the agreement. The defendants dispute the accuracy of these figures.

5. 36 C.F.R. § 2.39(c).

6. 36 C.F.R. § 2.39(c)(4).

7. 36 C.F.R. § 2.39(d).

A permit was issued to the Plaintiffs on January 17, 1978 after their application was made in conformance with the challenged regulation. This permit included the area designations made by the superintendent pursuant to subsection (d) of the regulation.[8] On January 27, 1978, Plaintiff Liberman went to the office of the defendant Schesventer and requested that the Plaintiffs be allowed to carry on their activities in areas which had previously been designated as unavailable. He was told that the request would be considered, and that he would be notified the following week as to the decision. This action was filed on January 27, 1978. On January 31, 1978, the Plaintiffs received a letter from acting superintendent, Robert C. Amdor, stating that after conferring with the regional office of the National Park Service it had been determined that the areas made available for the activities covered by the permit could not be expanded, and that the Plaintiffs request would be denied. The Plaintiffs have voluntarily ceased all activity at the fort pending the disposition of this action.

## II

The Plaintiffs have alleged that the regulation is unconstitutional on its face, and as applied, in that it grants unbridled authority to Defendant to grant or deny a permit to perform an activity protected by the first amendment. They assert that the denial of their request to perform Sankirtan in areas which had been designated as unavailable for sale and distribution of printed matter was arbitrary and capricious. The Plaintiffs also contend that the regulation lacks procedural protections required by the fifth and first amendments, thus constituting a denial of due process. Defendants, on the other hand, argue that the challenged regulation is a reasonable restriction as to the

8. See map, Appendix B.

9. The ritual practice of Sankirtan has been found to be protected by the first amendment in numerous cases. *See, e. g., International*

time, place and manner of first amendment activity. They further contend that no special procedures are constitutionally mandated.

As an aid to analysis, several questions may be posed. First, is the Plaintiffs' activity protected by the first amendment? Second, if so, to what extent may it be restricted, if at all? Third, is the challenged regulation within constitutional boundaries? Fourth, what procedural safeguards are required by the first amendment in this context?

The Defendants have stipulated to the fact that the practice of Sankirtan is protected by the first amendment. It has been clearly and consistently established that this type of religious activity comes within the ambit of first amendment protection. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1939); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).[9] It is thus incumbent upon the Court to determine whether, and to what the extent the activity may be regulated.

The freedom of an individual to hold religious beliefs and opinions is absolute. It may not be restricted in any way. *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). However, the right to take action on behalf of one's beliefs, while embraced by the first amendment, is subject to reasonable regulation designed to safeguard the competing rights of others, applied in a non-discriminatory fashion.

The Supreme Court has taken the position that, "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the 'non-speech' element can justify incidental

*Society for Krishna Consciousness v. City of New Orleans*, 347 F.Supp. 945 (E.D.La.1972); *International Society for Krishna Consciousness v. Hays*, 438 F.Supp. 1077 (S.D.Fla.1977).

limitations on first amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). The task of the regulator in these instances lies in the proper balancing of first amendment rights against other legitimate interests in a manner which is both constitutional and an acceptable accommodation of all factors. In addition, the scheme of regulation must not present a risk of abuse through the grant of a broad censorship power.[10]

■ A general rule may be drawn from the decisions in which a governmental attempt at regulation has been weighed against the first amendment: Incidental restrictions upon the exercise of first amendment rights may be imposed in furtherance of a legitimate governmental interest if that interest is unrelated to the suppression of expression, and if the restrictions are no greater than necessary for the protection of the governmental interest.[11]

■ Governmental interests relied upon to support the challenged regulation are generally those which are contained in subsection (d) of the regulation.[12] They include the maintenance of an atmosphere of peace and tranquility in historical settings, among other aesthetic considerations; public safety and order; and the prevention of interference with visitors services or other administrative functions of the National Park Service. The significance of any purported governmental interest must be considered in light of the operation of the regulation designed to promote it, and the effect on those regulated. The interests relied upon here are legitimate concerns of government in this context, and are unrelated to the suppression of free expression.

It is important to remember that the interests outlined in subsection (d) are not criteria which are applied by the Park superintendent upon being presented with an application for a permit. If that were the case, the permit system would stand on a wholly different constitutional footing. The risk would then be presented that the substance of the applicant's message could influence the grant or denial of the permit.[13] To the contrary, the permit system challenged here calls for the designation of unavailable areas *before* any application is presented. It is the process of designation during which the discretion granted by the regulation is exercised. When the application is presented, the duties of the administrative official are ministerial in nature.

Careful consideration must also be given to the question of whether the challenged regulation sweeps more broadly than is necessary to promote the legitimate governmental interests.[14] The challenged regulatory scheme does not entail a total ban of

10. The Supreme Court has consistently struck down licensing systems "which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." *Kunz v. New York*, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951). *See also, Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); *Shuttlesworth v. Birmingham*, 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

11. *See, United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Procunier v. Martinez*, 416 U.S. 396, 409–15, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *A Quaker Action Group v. Morton*, 516 F.2d 717. The court also recognizes that the burden is on the government to justify the restriction placed upon the plaintiff. *Bayou Landing, Ltd. v. Watts*, 563 F.2d 1172, 1175 (5th Cir. 1977).

12. Defendant Schesventer, during his testimony at the hearing, rendered further interpretation of the interests sought to be promoted through application of the subsection (d) criteria.

13. "Above all else, the first amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). *See, Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

14. The question is "whether the regulations at issue here are 'unnecessarily restrictive for the purpose they are designed to serve'." *A Quaker Action Group v. Morton*, 516 F.2d 717, at 723–24, *quoting, A Quaker Action Group v. Morton*, 148 U.S.App.D.C. 346, 352, 460 F.2d

the Plaintiffs' activities at the Monument. They are free to solicit in all areas except those designated as unavailable. It is the Court's opinion that the regulation promotes the governmental interest in the least restrictive manner.

There is no evidence of arbitrary or capricious administration of the regulation. The Plaintiffs assert in their complaint that the Defendant, Schesventer, "refuse(d) to allow the Plaintiffs a permit to engage in their religious activities for the sole reason that he wished to curtail said religious activities on the Fort grounds . . ." *Original Complaint*, at 5. This allegation is in error on two counts. First, the Plaintiffs *were* granted a permit to sell and distribute printed matter at the National Monument. It was their further request to perform this activity in the restricted areas which was denied. Second, there is no evidence that the content of the printed matter, or the substance of the beliefs which Plaintiffs espouse was a factor in any decision made by the Defendant.

The court finds that the designation of areas as unavailable for the sale and distribution of printed matter was undertaken pursuant to the guidelines of the challenged regulation. The evidence establishes that the areas in question were all justifiably designated as unavailable. The Plaintiffs' contentions in this regard are unfounded.

### III

The Plaintiffs also attack the regulation on the grounds that it deprives them of due process under the fifth and first Amendments.[15] Specifically they cite the case of *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and assert that the regulatory scheme must provide the procedural protections outlined by the Supreme Court in that case. In *Freedman* the Court was presented with a state statute which made it unlawful to exhibit a motion picture without first submitting it to a censorship board for approval. Noting the "peculiar dangers to constitutionally protected speech presented by a censorship system", the Court held that material which is unprotected by the first amendment can be subjected to prior restraint,[16] however, a system of prior restraint will be in violation of the first amendment if it lacks certain procedural safeguards:

> *First*, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. *Second*, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. *Third*, a prompt final judicial determination must be assured.

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975).[17]

■ This Court agrees that in the area of censorship, and regulation of arguably obscene matter, the constitutional guarantee

---

854, 860 (1971). *See, Procunier v. Martinez, supra* note 11, 416 U.S. at 413, 94 S.Ct. 1800; *United States v. O'Brien, supra* note 11, 391 U.S. at 377, 88 S.Ct. 1673.

**15.** In erecting procedural safeguards to protect the exercise of first amendment freedoms the Supreme Court has gone beyond the traditional requirements of due process and has turned directly to the first amendment as a source of the procedural requisites. *See*, Monaghan, *First Amendment "Due Process"*, 83 Harv.L. Rev. 518 (1970); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649.

**16.** The doctrine of prior restraint has generally been defined "as prohibiting the imposition of governmental restriction . . . upon speech in advance of publication." T. Emer-

son, *The System of Freedom of Expression* 503–04 (1970). The Supreme Court, however, has yet to clearly specify what constitutes a prior restraint. *See*, Litwack, *The Doctrine of Prior Restraint*, 12 Harv.C.R.–C.L.L.Rev. 519 (1977).

**17.** The *Freedman* doctrine has been applied in contexts other than movie censorship. *See, e. g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (Permit requirement for use of municipal entertainment facility); *LeFlore v. Robinson*, 434 F.2d 933 (5th Cir. 1970) (Licensing of demonstrations).

of due process prevents the erosion of first amendment protection through procedures which sweep too broadly with too little discrimination.[18] However, as the Supreme Court stated, "(t)he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Differences existing between various regulatory schemes which come under scrutiny well illustrate the necessity for flexibility. The question of whether a movie or a stage presentation is obscene is a difficult and subjective determination. Likewise, a governmental official having unbridled discretion to grant or deny a permit to march on public streets may well be influenced by the ideas which the applicant wishes to publicize. In these cases it is clear that "only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression." *Freedman, supra*, 380 U.S. at 58, 85 S.Ct. at 739. The regulation challenged here, however, is content-neutral, and the permit may not be withheld "upon the uncontrolled will of an official." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969). This case does not present a censorship problem, and this fact must be emphasized as the court determines whether the procedure involved here shows adequate sensitivity to first amendment freedoms.

■ The court thus finds that the procedures outlined in *Freedman* are not required here. This is not to say that adherence to proper procedures is unimportant. When areas of the National Monument are designated as available for sale and distribution of printed matter, the area is delineated on a map which is posted in the Park superintendent's office. Parties wishing to challenge the designations are free to do so, as Plaintiffs have done here. The regulation states that when a permit is denied, "the applicant shall be so informed in writing." [19] In addition, the reasons for a permit revocation must be stated in writing.[20] The procedures are sufficient to pass constitutional muster in this context.

The court concludes that the regulation is a constitutional means of accommodating the conflicting interest of the Plaintiffs in exercising their first amendment rights, and the government in the maintenance of a safe and historically appropriate atmosphere for the public enjoyment of the National Monument.

WHEREUPON, it is the determination of this court that the Plaintiffs have failed to establish their right to declaratory or injunctive relief, and that judgment is rendered in favor of the Defendants.

## APPENDIX A

§ 2.39 Sale and distribution of printed matter.

(a) The sale or distribution of printed matter is permitted within park areas, provided a permit to do so has been issued by the Superintendent, and provided further that the printed matter is not solely commercial advertising.

(b) Any application for such a permit shall set forth the name of the applicant; the name of the organization, if any; the date, time, duration, and location of the proposed sale or distribution; and the number of participants.

(c) The Superintendent shall, without unreasonable delay, issue a permit on proper application unless:

---

18. *See*, Monaghan, *supra* note 15.

19. 36 C.F.R. § 2.39(c).

20. 36 C.F.R. § 2.39(i).

(1) A prior applicant for a permit for the same time and location has been made which has been or will be granted and the activities authorized by that permit do not reasonably permit multiple occupancy of the particular area; or

(2) The sale or distribution will present a clear and present danger to the public health or safety; or

(3) The number of persons engaged in the sale or distribution exceeds the number that can reasonably be accommodated in the particular location applied for; or

(4) The location applied for has not been designated as available for the sale or distribution of printed matter; or

(5) The activity would constitute a violation of an applicable law or regulation.

If an applicant for a permit is denied, the applicant shall be so informed in writing, with the reason(s) for the denial clearly set forth.

(d) The Superintendent shall designate on a map, which shall be available for inspection in the Office of the Superintendent, the locations within the park area that are available for the sale or distribution of printed matter. Locations may be designated as not available only if the sale or distribution of printed matter would:

(1) Cause injury or damage to park resources; or

(2) Unreasonably impair the atmosphere of peace and tranquility maintained in wilderness, natural, historic, or commemorative areas; or

(3) Unreasonably interfere with interpretive, living history, visitor services, or other program activities or with the administrative functions of the National Park Service; or

(4) Substantially impair the operation of public use facilities or services of National Park Service concessioners or contractors.

(e) The permit may contain such conditions as are reasonably consistent with protection and use of the park area.

(f) No permit shall be issued for a period in excess of 14 consecutive days, provided that permits may be extended for like periods, upon a new application, unless another applicant has requested use of the same location and multiple occupancy of that location is not reasonably possible.

(g) Persons engaged in the sale or distribution of printed matter under this section shall not obstruct or impede pedestrians or vehicles, harass park visitors with physical contact or persistent demands, misrepresent the purposes or affiliations of those engaged in the sale or distribution, or misrepresent whether the printed matter is available without cost or donation.

(h) The sale or distribution of printed matter without a permit, or in violation of the terms or conditions of a permit, is prohibited.

(i) Any permit may be revoked under any of those conditions, as listed in paragraph (c) of this section, which constitute grounds for denial of a permit, or for violation of the terms and conditions of the permit. Such a revocation shall be made in writing, with the reasons(s) for revocation clearly set forth, except under emergency circumstances, when an immediate verbal revocation or suspension may be made, to be followed by written confirmation.

Appendix B to follow.

## APPENDIX B

CASTILLO DE SAN MARCO
NATIONAL MONUMENT

The darkened areas have been designated as unavailable for sale and distribution of printed matter pursuant to 36 C.F.R., Section 2.39(d)

N

PARK BOUNDARY — — — —

FOOTPATHS

ROADS

CASTILLO DRIVE

PARKING AREA

FLORIDA A1A

CUBO LINE

CITY GATE

FORT GREEN

ADMINISTRATION BUILDING

DRIVE