

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. PD-0893-14
NO. PD-0894-14

**JOEY DARRELL FAUST, Appellant**

**v.**

**THE STATE OF TEXAS**

**RAMON MARROQUIN, Appellant**

**v.**

**THE STATE OF TEXAS**

ON STATE'S PETITIONS FOR DISCRETIONARY REVIEW
FROM THE SECOND COURT OF APPEALS
TARRANT COUNTY

**KELLER, P.J.,** filed a dissenting opinion.

Now wait a minute. After a gay-pride parade, police stop members of the Kingdom Baptist

Church–and no one else–from walking down a public street. The police do this because they think

that the views expressed by the group during the parade are "hateful" and because at the parade a year earlier, a different member of the church assaulted a gay man. This cannot be right. The First Amendment protects freedom of speech, even speech that is "hateful."

The primary issue before us is what standard should be used to evaluate whether the police-imposed restriction on the church members' speech is valid. The Court applies the traditional intermediate scrutiny test for content-neutral "time, place, or manner" restrictions that are imposed by law. This is the wrong standard for two reasons. First, there is a difference between a *law* imposing a "time, place, or manner" restriction and *police officers* imposing such a restriction on their own. Second, the restriction in this case was not content-neutral; it was viewpoint-based. Because the First Amendment requires the restriction here to be judged by a more rigorous standard than that employed by the Court, and the restriction cannot be justified under a more rigorous standard, I must dissent.

I write also to express my disagreement with the concurring opinions' view that appellants can still be convicted even if the police officers acted in violation of the First Amendment.

## I. THE EVIDENCE

The officers in this case were concerned about the possibility of violence between members of the 2012 gay-pride parade and members of the Kingdom Baptist Church. Although the sergeants' testimony contains some references to prior "altercations" between members of these two groups, the only incident that was specifically described as occurring at the 2011 parade was an assault on a gay man by a person named Chad Sutherland, against whom charges were never filed.[1] Sergeant

---

[1] *See Faust v. State*, 2014 Tex. App. LEXIS 6409, *8 (Tex. App.–Fort Worth June 12, 2014) (not designated for publication). Sergeant DeHoyos also testified that at the 2011 parade she heard protesters saying, "I hope you die in a fiery crash," and "go ahead and kill yourself, you faggot," and

DeHoyos testified that both Faust and Marroquin were at the 2011 gay-pride parade, that neither of them was arrested, and that neither of them was involved in a violent incident in that parade.[2]

Before the 2012 parade, police officers formed into several two-person teams that monitored the parade and the onlookers, and the parade traveled down Main Street past First, Second, and Third Streets without a violent incident.[3] It was only after the marchers had passed Third Street and the parade had ended that the police formed a skirmish line, at the intersection of Third and Main, between members of the Kingdom Baptist Church and the people who continued walking down Main Street toward the festival. The skirmish line remained in place until the people continuing down Main Street reached the 900 block, where the festival was taking place. Sergeants Genauldo and DeHoyos both testified that in 2011, after the incident with Chad Sutherland, a skirmish line was set up at the 900 block. Both officers further testified that the Kingdom Baptist Church members had honored that skirmish line. But at the 2012 parade, the officers decided to be "proactive" and

---

that the 2011 parade involved "an entire day of that type of speech being uttered by these individuals." The officer did not testify that either of the appellants had engaged in such comments.

[2] Sergeant Genualdo testified that Faust, Marroquin, and other members of the church would come out on Friday nights and engage in "what they claimed" was street preaching but other people claimed was a "verbal assault." Sergeant Genualdo also referred to it as "verbally assaulting" people. No attempt was made to describe these incidents in detail.

[3] During this time, there were twenty to thirty church members, who were "preaching or expressing their views." Sergeant DeHoyos did not remember what was said, but she testified that they had signs that said something like "believe in Jesus or burn in hell for being gay" or rebuked people for being gay or having gay family and saying that they were going to go to hell or burn in hell if they did not repent of their sins. Video recordings of the offenses and the events surrounding the offenses were introduced into evidence. Signs that are visible in these video recordings say, among other things, "Let the Wicked Forsake His Way," "Turn to Jesus or Burn in Hell," "It's Time to Repent," "God is Angry with the Wicked Every Day," and "What the Bible Says About Homosexuality." The signs generally have specific references to chapters and verses of the Bible and they call for viewers to repent and turn to God, but at least one makes no reference to religion at all.

set up a skirmish line six blocks away from the line imposed in 2011 and the ultimate destination of the paraders. Sergeant DeHoyos acknowledged that people detained at Third Street would not be able to communicate with people in the 800 or 900 block of Main Street. The officers maintained the fixed line for every member of the church regardless of whether a particular member had ever previously been involved in any violent incidents. The stated justification for doing this was the officers' perception that there was a possibility that violence could occur.[4]

## II. LEVEL OF SCRUTINY

### A. Time, Place, or Manner Restrictions

#### 1. *Restrictions Imposed by Laws of General Applicability vs. Restrictions Imposed by Other Sources*

Even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided that the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant

---

[4] Sergeant Genualdo testified, "There is always the possibility of a physical altercation between two groups that disagreed. Since we had a history of it in the past, and I'm assuming that Mr. Faust doesn't normally engage in physical altercations, it was my duty to make sure that neither side got into a physical altercation." Then the following colloquy occurred:

Q. Did you see any evidence of him engaging in any physical altercations?

A. No.

Q. But it was your suspicion that if he went by you, he might do that; is that correct?

A. There certainly was a possibility that that would occur, yes.

Q. Is there also a possibility that he wouldn't engage in a physical altercation?

A. Yes.

governmental interest, and that they leave open ample alternative channels for communication of the information.[5]  In such cases, intermediate scrutiny is the proper test.  This is not necessarily the test, however, when the restriction is imposed by something other than a law (or ordinance or regulation) of general applicability.  The restriction in the present case was imposed not by a law of general applicability, but as the result of a case-specific determination by the police.

In *Madsen v. Women's Health Center*, the Supreme Court addressed the proper standard for evaluating a content-neutral "time, place, or manner" restriction imposed by an injunction.[6]  Although the case before us does not involve an injunction, police-imposed restrictions are similar to injunctions in that neither is the result of a law of general applicability.  According to *Madsen*, that makes a difference.

In *Madsen*, the Court explained that the traditional intermediate-scrutiny test articulated in cases such as *Ward v. Rock Against Racism*[7] would apply "[i]f this were a content-neutral, generally applicable statute [or ordinance], instead of an injunctive order."[8]  But the Supreme Court found obvious differences between these two sources of "time, place, or manner" restrictions.[9]  While ordinances represent a legislative choice to promote certain societal interests, injunctions are

---

[5]  *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984).

[6] 512 U.S. 753, 765 (1994).

[7]  491 U.S. 781 (1989).

[8]  *Madsen*, 512 U.S. at 765 (bracketed material added to reflect subsequent references to ordinances in the Court's discussion).

[9]  *Id.*

remedies imposed for violations of a legislative or judicial decree.[10] Injunctions "carry greater risks of censorship and discriminatory application" than do general statutes or ordinances.[11] "There is no more effective practical guaranty against arbitrary and unreasonable government," the Supreme Court explained, "than to require that the principles of law which officials would impose upon a minority must be imposed generally."[12]

The Supreme Court concluded that the "standard time, place, and manner analysis is not sufficiently rigorous" and that, when an injunction is challenged on First Amendment grounds, "a somewhat more stringent application of general First Amendment principles" is required.[13] The Court concluded that the correct standard for evaluating a challenge to a content-neutral provision of an injunction is whether the provision "burden[s] no more speech than necessary to serve a significant government interest."[14]

Justice Scalia, joined by Justices Kennedy and Thomas, would have required strict scrutiny.[15] In Justice Scalia's view, although a speech-restricting injunction might not attack content *as content*, "it lends itself just as readily to the targeted suppression of particular ideas."[16] He said, "Such targeting of one or the other side of an ideological dispute cannot readily be achieved in speech-

---

[10] *Id.*

[11] *Id.*

[12] *Id.* (quoting *Railway Express Agency v. New York*, 336 U.S. 106, 112-13 (1949)).

[13] *Id.*

[14] *Id.*

[15] *Id.* at 790-95 (Scalia, J., concurring and dissenting).

[16] *Id*. at 793.

restricting general legislation except by making content the basis of the restriction; it is achieved in speech-restricting injunctions almost invariably."[17]

In the case before us, police created a skirmish line to prevent members of the Kingdom Baptist Church from walking down Main Street after the 2012 gay-pride parade until the people from the parade traveled six blocks south to the festival. This time and place restriction imposed by the officers was not imposed pursuant to any statute or ordinance. Even if we assume that this police-imposed restriction was content-neutral, it more closely resembles the imposition of a time, place, or manner restriction by an injunction than by a law.

Moreover, the idea that the absence of such a law mandates a stricter standard of review is supported by Supreme Court caselaw involving ordinances that place broad discretion in the hands of a public official to grant or deny a permit to engage in First Amendment expression at certain times and places.[18] The Court has held that such an ordinance must "contain adequate standards to guide the official's decision and render it subject to effective judicial review."[19] Where legislative guidance is lacking, it follows that the standard of review must be more rigorous.[20] Consequently, the traditional intermediate-scrutiny test is inadequate here. At the very least, the test should be

---

[17] *Id.*

[18] *See Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002).

[19] *Id.*

[20] The Court contends that there is a "distinction between analyzing First Amendment challenges to an injunction . . . and analyzing a First Amendment challenge to a police skirmish line order, which is a government imposed restriction pursuant to statutory authority." I assume the statutory authority to which the Court refers is Article 2.13 of the Texas Code of Criminal Procedure. But that provision, which simply gives peace officers the duty "to preserve the peace within the officer's jurisdiction," provides absolutely no standards for guiding the decision-making of the police with respect to imposing restrictions on freedom of expression.

whether the challenged provision "burden[s] no more speech than necessary to serve a significant government interest."

## 2. *Duration of Restriction*

Judge Johnson's concurring opinion points out that the officer-imposed restriction in this case was temporary. It is true that the restriction in *Madsen* was a permanent injunction.[21] Nevertheless, when political or social expression is involved, the timing of that expression may be an important element.[22] In the context of protests at expressive events for which a permit has been obtained, courts have suggested that a protester should be allowed free access as long as he does not interfere with the expressive activities of the event participants.[23] Only when the protester begins to disrupt

---

[21] *See Madsen*, 512 U.S. at 758.

[22] *Carroll v. President & Commissioners of Princess Anne*, 393 U.S. 175, 182 (1968) ("The present case involves a rally and 'political' speech in which the element of timeliness may be important. As MR. JUSTICE HARLAN, dissenting in *A Quantity of Books v. Kansas*, pointed out, speaking of 'political and social expression': 'It is vital to the operation of democratic government that the citizens have facts and ideas on important issues before them. A delay of even a day or two may be of crucial importance in some instances.'"); *Elrod v. Burns*, 427 U.S. 347, 373-74 & n. 29 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury . . . . The timeliness of political speech is particularly important."); *Collins v. Jordan*, 110 F.3d 1363, 1372-73 (9th Cir. 1996) ("Courts have many times emphasized the importance of government's permitting the public to engage in spontaneous First Amendment activity, such as demonstrations, in response to controversial events. . . . Banning or postponing legitimate expressive activity because other First Amendment activity regarding the same subject has resulted in violence deprives citizens of their right to demonstrate in a timely and effective fashion.").

[23] *See Startzell v. City of Philadelphia*, 533 F.3d 183, 194-95 (3d Cir. 2008) (referring to "the long line of authority upholding free access by the general public to street festivals and other events held in traditional public fora" and holding that the event hosts could not exclude "dissenting speakers on the Philadelphia streets and sidewalks where [the event] took place" but also holding that "[t]he right of free speech does not encompass the right to cause disruption, and that is particularly true when those claiming protection of the First Amendment cause actual disruption of an event covered by a permit"); *Parks v. City of Columbus*, 395 F.3d 643, 652-54 (6th Cir. 2005) (improper to exclude a person from arts festival on the basis of his wearing a sign that communicated

the activities of the event does "the existence of a permit tilt[] the balance in favor of the permit-holders" to allow a restriction.[24]

### 3. *The Restriction Imposed by the Police Does Not Satisfy the Standard Applicable to Injunctions*

Because I believe that the restriction in this case was viewpoint-based instead of content-neutral, I will not spend too much time explaining why I believe that it fails the *Madsen* test, which applies to content-neutral restrictions. Suffice it to say that a moving skirmish line, or the two-person teams used successfully during the 2012 parade, or a repeat of the effective 2011 skirmish line should have been adequate to address police concerns while lessening the burden on the protestors' speech. The fixed skirmish line therefore burdened more speech than necessary to achieve the interest of preventing violence.[25]

---

a religious message when he was acting peacefully during the event). *See also Gathright v. City of Portland*, 439 F.3d 573, 576-79 (9th Cir. 2006) (Policy allowing permit holder at an expressive event to exclude unwanted individuals on the basis of their views violated the First Amendment.).

[24] *See Startzell*, 533 F.3d at 199 (Police could move protesters away from event activities when protesters were using bullhorns and microphones in an attempt to drown out the platform speakers.).

[25] In a footnote, the Court suggests that the skirmish line could be justified either because appellants' used "fighting words" or because there was a risk that they would use "fighting words" in close proximity to the paraders and thus risk the eruption of violence. The Court points to Faust's statement to Sergeant Genualdo that he was working for a lesbian and he was a "fag" who needed to put on earrings and put a bow in his hair. But even speech that arouses anger or hatred is protected by the First Amendment. *Virginia v. Black*, 538 U.S. 343, 366 (2003) ("It may be true that a cross burning, even at a political rally, arouses a sense of anger or hatred among the vast majority of citizens who see a burning cross. But this sense of anger or hatred is not sufficient to ban all cross burnings."). To qualify as fighting words, the utterance must be "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574 (1942). I am skeptical that Faust's statements would qualify as such, even if directed at the paraders, and there is no evidence that violence or unrest was brewing in the crowd. As for the police, the officers remained calm and acted professionally throughout the entire episode.

## B. Strict Scrutiny

### 1. *The Restriction in this Case was Content-Based or Viewpoint-Based, Requiring the Application of the "Strict Scrutiny" Standard.*

The First Amendment reflects a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open."[26] Public streets and sidewalks are traditional public fora that "time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."[27] A time, place, or manner restriction that is content-based must satisfy strict scrutiny if the restriction occurs in a public forum, as it did here.[28] The restriction in this case was content-based because whether protesting church members were allowed to walk down Main Street depended entirely upon what they said and what was written on their signs. Everyone except members of the church and others who might have had similar signs was allowed to pass.

Moreover, the officers' own testimony shows that the restriction was not just content-based, but viewpoint-based. When Sergeant Guenaldo was asked whether "it was because [Faust] was a

---

Further, even if Faust's post-restriction statement were relevant to whether Faust should have been allowed to cross the skirmish line, it was not relevant to the validity of the skirmish line with respect to *Marroquin*. The only specific statements recited in the record as being made by either Faust or Marroquin at the parade before the imposition of the skirmish line that were inflammatory with respect to members of the parade were signs that suggested that homosexuals would go to hell or burn in hell. But religions and religious groups often make claims about hell and what may cause someone to end up there. These signs communicated a religious viewpoint, and do not themselves convey fighting words.

[26] *Boos v. Barry*, 485 U.S. 312, 318 (1988) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).

[27] *Id.*

[28] *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009).

member of this church group" that the police would not let him go down the street, he indicated that that was true of not just Faust, but the whole group. When asked why other members of the public were permitted to cross through the skirmish line he said, "Because they were not members of that church, they were not members of the group that were historically causing problems."

The sergeant was concerned that Faust would use "the same terminology and words" he used on the sergeant. When asked whether he thought a member of the public who uses those words is subject to arrest, the sergeant answered, "Well, I know two things. Number one, that the use of profanity is against Texas state law under disorderly conduct. Number two, I know that those kind of words are not protected as free speech under the U.S. Constitution." Sergeant Guenaldo said the unprotected words to which he was referring were "the part about lesbians and putting bows in my hair and such."

Sergeant DeHoyos testified that, in reference to the parade and protest the prior year, she asked herself whether it was hate speech or free speech "because they were berating people." She said that, in this case, members of the church were "preaching or expressing their views." She said the words were "abusive" and "very hateful," but not profane.

Other people were allowed to pass through the skirmish line "[b]ecause they were not part of the Kingdom Baptist Church." But anyone else who was carrying signs that the officer considered to be "provocative" would also have been detained. Sergeant DeHoyos testified that "the message on the sign" was part of the reason that Faust and Marroquin were stopped.

Sergeant DeHoyos's police report said that the Kingdom Baptist Church has "extreme anti-homosexual views," by which she meant "it wasn't just repent your sins," it was "the language they used to get people to want to repent their sins," which she said was, to her, "an extreme view."

When asked whether it was the officer's understanding that the church members wanted to go to where the other group was meeting in order to express their religious views, the officer answered, "Yes and no." She said:

> The no is that yes, they would express their religious views, but that it wouldn't just be religious views, that it would – the language that they used was very hateful, hurtful, berating, degrading, humiliating. To me, that – that is not necessarily a religious view.

Although the officer denied that she was making a distinction between what she thought would be a proper religious view and what the church members might think would be a proper religious view, she clearly was doing just that. And she acknowledged that it would be the members' viewpoint, religious or otherwise, that they wanted to express. For all of these reasons, I conclude that the restriction was viewpoint-based.

### 2. *The Possibility of Violence Did Not Justify the Restriction*

The mere possibility of violence is not sufficient to impose even modest restrictions on freedom of speech: The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden."[29] Where evidence shows no more than that the opinions being peaceably expressed are "sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection . . .'the compelling answer . . . is that constitutional rights may not be denied simply because of hostility to their assertion or exercise.'"[30]

---

[29] *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 392 (2000); *see also McCutcheon v. Federal Election Commission*, 134 S. Ct. 1434, 1452 (2014) (op. of Roberts, C.J., joined by Scalia, Kennedy, and Alito, JJ.).

[30] *Cox v. Louisiana*, 379 U.S. 536, 551 (1965).

*Kunz v. New York* is instructive.[31] There, the Supreme Court considered the constitutionality of a city ordinance that required a permit to conduct public religious services.[32] In public, Kunz preached such things as, "the Catholic Church makes merchandise out of souls," Catholicism is "a religion of the devil," and the Pope is "the anti-Christ."[33] He denounced the Jews as "Christ-killers," and he said of them, "All the garbage that didn't believe in Christ should have been burnt in the incinerators. It's a shame they all weren't."[34] The Court held that the ordinance was clearly invalid as a prior restraint on the exercise of First Amendment Rights because it gave an administrative official discretionary power to control in advance the right of citizens to speak on the streets about religious matters.[35] Moreover, the Court refused to take into account the fact that meetings had, in the past, caused some disorder. It said, "There are appropriate public remedies to protect the peace and order of the community if appellant's speeches should result in disorder or violence. . . . New York cannot vest restraining control over the right to speak on religious subjects in an administrative official where there are no appropriate standards to guide his action."[36]

### 3. Other Factors Suggest that a Police-Imposed Restriction, Even if Content-Neutral, Is Subject to Strict Scrutiny

One reason the *Madsen* court declined to impose the strict-scrutiny standard in the injunction

---

[31] *Kunz v. New York*, 340 U.S. 290 (1951).

[32] *Id*. at 294-95.

[33] *Id*. at 296 (Justice Jackson dissenting).

[34] *Id.*

[35] *Id.* at 294-95 (Court's op.).

[36] *Id.*

context is that, though injunctions pose special dangers to free expression, the injunction is a somewhat limited tool, applying to individuals or groups who have engaged in illegal activity.[37] We might add that an injunction is a judicial process with procedural protections, that there are requirements that must be satisfied to obtain an injunction,[38] that adverse parties have the opportunity to contest or suggest modifications to an injunction,[39] that injunctions give advance notice of what is prohibited, and that injunctions describe in detail in written form what is prohibited. Advance notice of a detailed description of a time, place, or manner restriction might at least give those subject to an injunction the ability to plan ahead to maximize the effectiveness of their expressive activities even while complying with the restriction.

But none of these protections associated with an injunction were associated with the police-imposed restriction in this case. There was no advance notice that there would be a skirmish line. Appellants and the other members of the Kingdom Baptist Church were not afforded any opportunity to object to the skirmish line in front of a neutral decision-maker or to suggest modifications.

---

[37] *Madsen*, 512 U.S. at 766 ("JUSTICE STEVENS believes that 'injunctive relief should be judged by a more lenient standard than legislation,' because injunctions are imposed on individuals or groups who have engaged in illegal activity. *Post*, at 778. JUSTICE SCALIA, by contrast, believes that content-neutral injunctions are 'at least as deserving of strict scrutiny as a statutory, content-based restriction.' *Post*, at 792. JUSTICE SCALIA bases his belief on the danger that injunctions, even though they might not 'attack content as *content*,' may be used to suppress particular ideas; that individual judges should not be trusted to impose injunctions in this context; and that an injunction is procedurally more difficult to challenge than a statute. *Post*, at 793-794. We believe that consideration of *all* of the differences and similarities between statutes and injunctions supports, as a matter of policy, the standard we apply here.") (emphasis in original).

[38] *See Kansas v. Nebraska*, 153 S. Ct. 1042, 1059 (2015) (to obtain an injunction, moving party must show "a cognizable danger of recurrent violation").

[39] *See Carroll*, 393 U.S. at 181-82 (discussing importance in injunction context of making reasonable efforts to notify adverse parties before restraining expression).

Nothing in the record suggests that appellants or other members of the church were told how long the skirmish line would be in effect, and in fact, the officer who dealt with Faust testified that he gave Faust no such indication.

Essentially, the officers imposed injunctive-type relief without obtaining an injunction.[40] It is unlikely that an injunction could have been obtained authorizing the fixed skirmish line that was imposed here because appellants had no history of being involved in physical altercations. But an attempt could have been made to obtain an injunction, and perhaps the police might have been able to produce more evidence at a hearing. It appears that the gay-pride parade was an annual event, so there would have been time to attempt to obtain an injunction imposing the skirmish line. It stands to reason that the imposition of a time, place, or manner restriction without an injunction when one could have been sought (or was sought, but unsuccessfully) should be subject to a higher level of scrutiny than such a restriction imposed by an injunction.

### 4. *The Restriction Does Not Satisfy Strict Scrutiny*

To satisfy strict scrutiny, a restriction must be narrowly drawn to serve a compelling government interest.[41] In this context, "narrowly drawn" means the least restrictive means of achieving the government interest.[42] No one has suggested that the fixed skirmish line satisfies this test, and I agree that it does not.

### II. PUNISHMENT FOR DISOBEYING POLICE ORDERS

---

[40] Sergeants Genualdo and DeHoyos both testified that there was no court order imposing (or even authorizing) the skirmish line.

[41] *Ex parte Thompson*, 442 S.W.3d 325, 344 (Tex. Crim. App. 2014).

[42] *Id.*

The concurrences contend that, even if the skirmish line violated appellants' First Amendment rights, they could be punished for interfering with the reasonable exercise of police authority without violating the First Amendment. The concurrences rely, by analogy, on resisting-arrest cases. But the resisting-arrest statute explicitly says, "It is no defense to prosecution under this section that the arrest or search was unlawful."[43] More to the point, an arrest does not, *by itself*, impose a restriction on First Amendment expression; rather, arrest is an enforcement mechanism for the violation of a law or order, and it is the law or order that might impose a restriction on expression. By contrast, as the present case illustrates, the interference-with-public-duties statute may encompass police orders that in themselves restrict expression.

If an unconstitutional restriction on freedom of speech were imposed by statute, a criminal defendant who disobeyed the statute would unquestionably be able to challenge the criminal prosecution against him by raising the statute's unconstitutionality.[44] By contrast, a defendant who disobeys a court order may not defend against a contempt prosecution on the basis that the order is unconstitutional if legal avenues to challenge the order were available.[45] But the police obtained no court order in the present case, and there was no time to prospectively challenge the police skirmish line in court.[46]

---

[43] TEX. PENAL CODE § 38.03(b).

[44] *See Spence v. Washington*, 418 U.S. 405 (1974) (overturning conviction based on statute barring the exhibition of a United States flag with attached figures, symbols, or other extraneous material because, as applied, statute unconstitutionally infringed on expression protected by the First Amendment).

[45] *See Walker v. City of Birmingham*, 388 U.S. 307 (1967).

[46] *See id.* at 318-19 (observing that "[t]here was an interim of two days between the issuance of the injunction and the Good Friday march" and that "Alabama procedure would have provided

When it comes to protests and other expressive demonstrations within the protection of the First Amendment, a police officer who issues an illegal order essentially acts like a lawmaker, and the State does not get a free pass to convict someone of a crime for violating such an order. In *Cox v. Louisiana*, Cox was convicted of violating a statute that made it a crime to congregate with others in a public space and refuse to disperse when ordered to do so by a law enforcement officer.[47] Cox led a group of students to protest segregation and discrimination and the arrest of 23 fellow students.[48] The protestors were assembled across the street from the courthouse.[49] After Cox urged them to sit in at lunch counters, the sheriff, deeming this statement to be inflammatory, took a power microphone and told the assembly to break up.[50] Making a gesture of defiance, Cox told the others "don't move," and the assembly did not break up until policemen exploded a tear gas shell at the crowd.[51] The Supreme Court reversed Cox's conviction, finding that, "allowing unfettered discretion in local officials in the regulation of the use of the streets for peaceful parades and meetings is an unwarranted abridgement of appellant's freedom of speech and assembly secured to him by the First Amendment."[52] The Court did not require Cox to submit to the order to disperse and relegate him to seeking a civil remedy after doing so. In a companion case, the Court stated that an order to

for an expedited process of appellate review" and concluding, "It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims.")

[47] 379 U.S. at 544.

[48] *Id.* at 545-46.

[49] *Id.* at 541.

[50] *Id.* at 543.

[51] *Id.* at 543-44.

[52] *Id.* at 558.

disperse that violated the First Amendment could not be used to sustain a conviction: "Assuming the place of the meeting was appropriate . . . nothing in [the relevant statutes] authorizes the police to draw the narrow time line, unrelated to any policy of these statutes, that would be approved if we were to sustain appellant's conviction on this ground."[53]

In *Flower v. United States*, the Supreme Court reversed the conviction of a person who distributed leaflets on a public street on a military base in violation of an order from the base commandant.[54] The Court said, because the military had abandoned any regulation of the street in question, "the base commandant can no more order petitioner off this public street because he was distributing leaflets than could a city police order any leafleteer off any public street."[55]

In a concurring opinion in *Gregory v. Chicago*, Justice Black explained the danger of imposing criminal liability on someone who engages in protected expression merely because, in doing so, he violated the order of a police officer:

> Their guilt of "disorderly conduct" therefore turns out to be their refusal to obey instanter an individual policeman's command to leave the area of the Mayor's home. Since neither the city council nor the state legislature had enacted a narrowly drawn statute forbidding disruptive picketing or demonstrating in a residential neighborhood, the conduct involved here could become "disorderly" only if the policeman's command was a law which the petitioners were bound to obey at their peril. But under our democratic system of government, lawmaking is not entrusted to the moment-to-moment judgment of the policeman on his beat. Laws, that is valid laws, are to be made by representatives chosen to make laws for the future, not by police officers whose duty is to enforce laws already enacted and to make arrests only for conduct already made criminal. One of our proudest boasts is that no man can be

---

[53] *Cox v. Louisiana*, 379 U.S. 559, 573 (1965) (referring back to breach of peace and obstruction of public passages statutes "with their broad sweep and application that we have condemned in" *Cox*, 379 U.S. at 553-58).

[54] 407 U.S. 197 (1972).

[55] *Id.* at 198.

convicted of crime for conduct, innocent when engaged in, that is later made criminal. To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of laws. There are ample ways to protect the domestic tranquility without subjecting First Amendment freedoms to such a clumsy and unwieldy weapon.[56]

Having concluded that the fixed skirmish line imposed by the police in this case violated the

First Amendment, I would affirm the court of appeals's decision to reverse appellants' convictions.

Because the Court does not, I respectfully dissent.

Filed: December 9, 2015
Publish

---

[56] 394 U.S. 111, 120-21 (1969) (Black, J., concurring).